# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 19-0915V
UNPUBLISHED

| | |
|---|---|
| JENNIFER IMM,<br><br>    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>    Respondent. | Chief Special Master Corcoran<br><br>Filed: April 8, 2022<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Tetanus Diphtheria<br>acellular Pertussis (Tdap) Vaccine;<br>Human Papillomavirus (HPV)<br>Vaccine; Bilateral Shoulder Injury<br>Related to Vaccine Administration<br>(SIRVA) |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Andrew Henning, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On June 24, 2019, Jennifer Imm filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered bilateral shoulder injuries related to vaccine administration ("SIRVA") as a result of Tetanus Diphtheria acellular Pertussis ("Tdap") and Human Papillomavirus ("HPV") vaccines received in her right and left arms,

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

respectively, on May 16, 2018. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$133,871.13**, **representing $130,000.00 for actual pain and suffering, and $3,871.13 for past unreimbursable expenses.**

### I.      Relevant Procedural History

On July 5, 2019, Petitioner filed Exhibits 1-9 containing medical records and an affidavit (ECF No. 8). An initial status conference was held on September 19, 2019 (ECF No. 12). On November 18, 2019, Petitioner filed Exhibits 10 and 11, containing physical therapy records and a supplemental affidavit (ECF No. 13).

On November 16, 2020, Respondent filed his report conceding that Petitioner was entitled to compensation (ECF No. 21). The following day, a ruling on entitlement was entered (ECF No. 23), and the parties began damages discussions. On August 4, 2021, Petitioner reported that the parties had reached an impasse and requested a status conference (ECF No. 32). Petitioner filed updated records as Exhibit 15 on September 7, 2021 (ECF No. 33).

Following a telephonic status conference on September 8, 2021, Petitioner filed a damages brief and Exhibits 16 and 17 containing supporting documentation for expenses and a supplemental affidavit (ECF Nos. 35, 36). Respondent filed his damages brief on December 9, 2021 (ECF No. 37), and Petitioner replied on December 16, 2021 (ECF No. 39). On March 1, 2022, the parties filed a joint status report confirming that they were amenable to an expedited hearing on motions day, and were available for this purpose on March 25, 2022 (ECF No. 43).

The Motions Day hearing occurred as scheduled on March 25, 2022, and this written decision memorializes my oral rulings issued at the conclusion of the hearing.[3]

### II.      Relevant Medical History

On May 16, 2018, Petitioner received a Tdap vaccine in her right deltoid, and her second dose of the HPV vaccine in her left deltoid. Ex. 1 at 2. At the time of vaccination,

---

[3] That ruling is set forth in the transcript from the hearing (ECF No. 45), which is fully incorporated into this Decision.

she was a 24 year old teacher. Ex. 4 at 6.

Thirteen days later, on May 29, 2018, Petitioner was seen by Dr. Ronald Schlotfeldt complaining of bilateral shoulder pain. Ex. 2 at 36. She reported that she had received the identified vaccines two weeks earlier, and since then had been having pain and decreased range of motion in both shoulders. *Id.* X-rays of both shoulders were negative. *Id.* at 53. She was assessed with acute pain of both shoulders and given naproxen and tramadol and referred to physical therapy. *Id.* at 38.

On June 7, 2018, Petitioner underwent a physical therapy evaluation of her right and left shoulders. Ex. 6 at 10-12. She reported that three weeks earlier she received vaccines in both arms and experienced intense bilateral shoulder pain thereafter. *Id.* Since then she had experienced difficulty lifting both arms overhead. *Id.* She reported a history of bursitis in her left shoulder approximately 2.5 years earlier.[4] *Id.* She stated that she was having difficulty with reaching overhead, pulling activities, donning and doffing shirts, and self-care activities such as washing her hair. *Id.* Her sleep was disturbed by the pain. *Id.* She reported bilateral shoulder pain of 4/10, ranging from 2/10 at best to 8/10 at worst. *Id.* Her active range of motion in flexion was 80 degrees on the right and 90 degrees on the left, and in abduction 70 degrees on the right and 65 degrees on the left.[5] She had positive impingement signs in both shoulders on the Hawkins/Kennedy and Neer tests, as well as positive signs on the empty can test in both shoulders. *Id.* at 12.

Petitioner continued physical therapy for over two years thereafter. Ex. 6 at 10-168; Ex. 10 at 2-108; Ex. 12 at 1-30; Ex. 13 at 1-85; Ex. 14 at 1-7. The parties are in agreement that she attended at least 133 physical therapy sessions over a 26-month period.[6]

On June 25, 2018, Petitioner was seen by orthopedist Dr. Oke Anakwenze for bilateral shoulder pain. Ex. 4 at 4. She reported that she had tried physical therapy but

---

[4] The record reflects that Petitioner had been treated for left shoulder impingement and tendinopathy in December 2015. Ex. 8 at 28-31. She attended physical therapy and was discharged on March 9, 2016, at which time she reported no pain. *Id.* at 171-72. The record does not contain further evidence of treatment for her left shoulder until after she received the May 16, 2018 Tdap and HPV vaccines. Thus, it appears that her previous left shoulder injury had resolved by the time she received the vaccines at issue in this case.

[5] Normal shoulder flexion for adults ranges from 165 to 180, and normal abduction for adults varies from about 170-180 degrees. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80 (F. A. Davis Co., 5th ed. 2016).

[6] Petitioner's damages brief asserts that she attended 137 sessions, while by Respondent's count she attended 133 sessions. The physical therapy records include "Visit No." notations that are not always accurate. In addition, it appears that records for some visits were initially omitted and later filed as Exhibit 14. These issues, along with the sheer volume of records, likely account for the differing calculations. In any event, I determine that there is not a significant difference between 133 and 137 sessions.

the pain persisted. *Id.* at 6. She rated her pain as 7/10. *Id.* Dr. Anakwenze assessed her with bilateral shoulder pain, noting that her presentation was unusual, and ordered an MRI of her left shoulder. *Id.* at 6-7.

On July 20, 2018, Petitioner underwent a left shoulder MRI. Ex. 7 at 1-2. The MRI revealed mild subacromial/subdeltoid bursitis, but no evidence of a rotator cuff tear. *Id.*

On September 5, 2018, Petitioner was seen by Dr. Alan Shahtaji. Ex. 5 at 28-31. She reported bilateral shoulder pain following May 16 HPV and Tdap vaccines. *Id.* She reported that her pain was currently 3/10, and 1/10 at rest. *Id.* On examination, she had full passive range of motion in both shoulders, but her active range of motion in flexion was limited to 150 degrees in her right shoulder and 120 degrees in her left shoulder. *Id.* at 29. She had pain with the empty can test, positive results on O'Brien's test, and positive results near the end range on Neer's test. *Id.* at 30. He assessed her with bursitis of the left shoulder and chronic pain of both shoulders, and administered an ultrasound-guided cortisone injection in her left shoulder. *Id.* He noted that she was improving but continued to experience bilateral shoulder pain, with the left worse than the right, and limited active range of motion. *Id.*

On September 17, 2018, Petitioner underwent a reassessment in physical therapy. Ex. 6 at 66. She reported improvement in bilateral shoulder range of motion and ability to perform functional activities such as washing her hair since starting physical therapy. *Id.* She continued to be limited in sleeping on her side, reaching overhead for donning and doffing clothes, and recreational activities such as playing the violin and yoga. *Id.* She had received a cortisone injection in her left shoulder, but continued to experience pain with active motion above shoulder height. *Id.* Her active range of motion in flexion was 120 degrees on the right and 115 degrees on the left, and in abduction 95 degrees on the right and 90 degrees on the left. *Id.*

On September 27, 2018, Petitioner was seen by sports medicine resident Dr. Sridevi Pokala and attending Dr. Sarah Merrill. Ex. 5 at 15. She reported bilateral shoulder pain that began on May 16 following bilateral shoulder vaccinations. *Id.* She reported that she had received a cortisone injection in her left shoulder on September 5, with no relief. *Id.* She stated that she had been undergoing physical therapy without improvement until Monday of that week when the physical therapist "popped" her left shoulder into place, and she regained full range of motion. *Id.* She reported that the pain was currently equal bilaterally and worsened with movement. *Id.* at 15-16. On bilateral shoulder examination, she exhibited decreased abduction and full range of motion in external and internal rotation. *Id.* at 17. She experienced pain in her lateral shoulders along the deltoid with the cross-arm and Speed's tests. *Id.* She had pain with the Neer's and Hawkins tests, and on the posterior apprehension and relocation test she had positive results on her left

shoulder and negative on her right shoulder. *Id.* at 18. Bilateral x-rays were negative. *Id.* at 7-9. Petitioner was referred for osteopathic medicine and acupuncture and advised to continue physical therapy. *Id.* at 18-20.

On October 30, 2018, Petitioner was re-assessed in physical therapy. Ex. 6 at 100. She reported a bilateral shoulder pain level of 2/10, ranging from 0-6. *Id.* She reported improvements in bilateral shoulder flexion and lifting ten pounds overhead. *Id.* She continued to be limited by moderate pain when reaching to the sides in abduction and in playing the violin and doing yoga. *Id.* She was able to play the violin for ten minutes before experiencing pain. *Id.* Her active range of motion had improved as well. In flexion, her active range of motion in both shoulders was 160 degrees. *Id.* In abduction, her right shoulder active range of motion was 120 degrees, and her left shoulder was 125 degrees. *Id.* She reported moderate pain with abduction. *Id.* She continued to exhibit positive signs in both shoulders on the Hawkins/Kennedy, Neer's, and empty can tests. *Id.* at 102.

Petitioner was reassessed in physical therapy on January 28, 2019. Ex. 10 at 9. She reported making significant improvements in bilateral shoulder abduction over the prior two weeks. *Id.* She reported decreased irritability with most activities of daily activities but noted a slight increase in pain when reaching across her body or lifting out to the sides. *Id.* She also reported improved bilateral shoulder flexion. *Id.* She was able to don and doff shirts without bilateral shoulder pain, and wash her hair with minor shoulder pain. *Id.* She reported bilateral shoulder pain, with the left worse than the right. *Id.* During the session she did not report pain, but at worst her pain level was 4/10. *Id.* Her active range of motion in flexion was 170 on both sides, and in abduction 175 degrees on both sides. *Id.* These numbers are generally considered to be within the normal range.[7] She was no longer exhibiting positive signs on either side on the Hawkins/Kennedy or Neer's tests, but continued to show positive signs on both shoulders on the empty can test. *Id.* at 11. The physical therapist noted that she was able to achieve full range of motion in shoulder flexion and abduction with less than 2/10 pain. *Id.* at 12. She was deemed ready to progress to a strengthening program to ensure she could maintain her range of motion gains. *Id.* She continued to demonstrate bilateral upper extremity weakness. *Id.*

Thereafter, Petitioner continued physical therapy throughout the rest of 2019 and until August 2020. Ex. 10, 12, 13, 14. Beginning on July 22, 2019, the pain ratings in her physical therapy reassessments indicated that the pain was only in the left shoulder,

---

[7] Normal shoulder flexion for adults ranges from 165 to 180, and normal abduction for adults varies from about 170-180 degrees. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80 (F. A. Davis Co., 5th ed. 2016).

suggesting that her right shoulder pain was improved by this time. Ex. 10 at 91; 12 at 19; 13 at 1, 40, 68.

The last physical therapy session in the record is a telehealth session dated August 19, 2020. Ex. 13 at 1. At this appointment, Petitioner reported that she was able to maintain, but not progress, with her home exercise program. *Id.* She wanted to continue with therapy because she was still having pain with playing the violin for more than 30 minutes, and once the pain flared up it lasted for about a week and a half. *Id.* She reported no current pain, and that at worst her pain was 3/10. *Id.* She was able to do daily yoga sessions without issue, but still experienced difficulty vacuuming. *Id.* Her active range of motion had remained stable for over a year, with active range of motion in flexion of 172 degrees on the right and 170 degrees on the left, and abduction of 175 degrees on the right and 170 degrees on the left. *Id.* Both shoulders continued to exhibit positive signs on the empty can test. *Id.* at 3. Petitioner had taken a three week break from therapy to see if she could continue to progress independently. *Id.* at 4. She was able to maintain pain free range of motion, but was unable to progress in her ability to play violin. *Id.*

On December 15, 2020, Petitioner was seen by Dr. Laura Alberton for bilateral shoulder pain. Ex. 15 at 1. She reported suffering significant bursitis and difficulty elevating her arms for about six months after her May 16, 2018 vaccinations. *Id.* She reported that now she was having a different type of problem, and that her shoulders sometimes felt like they were coming in and out of the socket. *Id.* This occurred less frequently with her right shoulder. *Id.* She reported that she felt catching, popping, clicking, and aching. *Id.* Dr. Alberton diagnosed her with instability of both shoulder joints, a tear of the left glenoid labrum, and labral tear of the right shoulder. *Id.* at 3. Dr. Alberton ordered a repeat MRI of her left shoulder, which revealed mild subacromial subdeltoid bursitis but was otherwise unremarkable. *Id.* at 9. The MRI showed that the glenoid labrum appeared to be intact. *Id.*

Petitioner returned to Dr. Alberton on January 5, 2021 to review the MRI. Ex. 15 at 11. On examination, she had full range of motion and mildly positive impingement signs on the left. *Id.* Dr. Alberton diagnosed Petitioner with generalized laxity of both shoulder joints and impingement and bursitis of the left shoulder. *Id.* Dr. Alberton did not recommend surgical intervention, and indicated that the bursitis may be causing her problems. *Id.* at 12. She offered a corticosteroid injection, which Petitioner declined because it had not helped in the past and her pain was somewhat improved. *Id.*

No further medical records were filed.

### III.    Affidavits

Petitioner filed three affidavits in support of her case. Exs. 9, 11, 17. She personally averred that the HPV vaccine administered in her left shoulder was the most painful injection she had ever received, so much so that she let out an involuntary scream. Ex. 9 at ¶ 2. The next morning, she awoke with throbbing pain in both shoulders, which persisted. *Id.* at ¶ 4.

For months thereafter, Petitioner represents, she cried for most of her hour-long commute to and from work, in part due to the physical pain of driving, but also from feeling helpless, frustrated, and worried that she would not get better. Ex. 9 at ¶ 9. She asserted that she attended physical therapy regularly for over two years, and for the last few months of this time saw little improvement. Ex. 17 at ¶ 2. She explained that she stopped physical therapy because her insurance changed and her physical therapist was not covered by any of her new insurance options, in addition to a lack of progress. *Id.* at ¶¶ 2-3. She has since been continuing 20-30 minutes of daily physical therapy exercises at home. Ex. 17 at ¶ 4. With this effort, she maintained her progress from formal therapy, but has not made additional progress. *Id.*

Petitioner asserts that having two shoulders injured at the same time resulted in additional challenges. Some tasks became impossible - she was unable to shower or dress herself, and could not sleep. Ex. 9 at ¶ 5. She asserted that she saw numerous doctors who said they had never heard of this type of injury and dismissed her pain, with an orthopedist suggesting that her problem was not physical but mental. Ex. 9 at ¶ 8.

These injuries, Petitioner claims, have restricted her ability to engage in things she previously enjoyed. She explained that throughout her life, playing the violin had been an outlet for pain and frustration, but that after her injuries she could not even lift her arms in the position needed to hold a violin. Ex. 9 at ¶ 10. She also could not swim, snorkel, dive, kayak, do yoga, or even try on clothes at a store, activities that had previously been joyful. *Id.* In an October 25, 2021 affidavit, she stated that a couple of weeks earlier she had attempted kayaking, but after a few minutes of paddling the pain in her shoulders became too much and she was unable to continue. Ex. 17 at ¶ 8.

### IV.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-

related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[8] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared

---

[8] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

## V.    Prior SIRVA Compensation Within SPU[9]

### A.    Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2022, 2,371 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,306 of these cases, with the remaining 65 cases dismissed.

Of the compensated cases, 1,339 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 88 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[10]

1,223 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

---

[9] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[10] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

The remaining 967 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[11] Agreement |
|---|---|---|---|---|
| **Total Cases** | *88* | *1,223* | *28* | *967* |
| **Lowest** | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,950.73 | $70,000.00 | $90,000.00 | $42,500.00 |
| **Median** | **$95,974.09** | **$90,000.00** | **$122,886.42** | **$60,390.00** |
| **3rd Quartile** | $125,269.46 | $116,662.57 | $161,001.79 | $88,051.88 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.    Pain and Suffering Awards in Reasoned Decisions

In the 88 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $94,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[12]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to

---

[11] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[12] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. The duration of the injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 95 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VI.    The Parties' Arguments

### A. Petitioner's Arguments

Petitioner requests an award of $175,000.00 for past pain and suffering. Pet. Br. at 1. Additionally, Petitioner asks that she receive $1,500.00 per year for future pain and suffering for the remainder of her life. *Id.* at 2. In addition, Petitioner requested unreimbursed expenses in the amount of $3,890.89. *Id.* However, at the damages hearing, Petitioner agreed to stipulate to unreimbursed expenses in the slightly-lesser amount proposed by Respondent, $3,871.13. *See also* Resp. Br. at 12.

Petitioner emphasizes that she experienced painful injuries to not one, but two, shoulders. Pet. Br. at 10. She asserts that over three years after her injury, she continues to experience pain and is limited in her use of her arms. *Id.* Petitioner asserts that she attended 137 physical therapy sessions, in addition to a cortisone injection, two MRIs, and several medical appointments. *Id.* at 11-12. Petitioner also argues that her pain impacted her ability to engage in many previously pleasurable activities, in particular playing the violin, and caused her mental anguish. *Id.* at 12.

Petitioner asserts that she "will be forced to live with her injury, in its current state, for the remainder of her life." Pet. Br. at 13. She characterizes the duration of her pain and loss of use as "literally forever." *Id.* at 14.

In support of her claimed award, Petitioner cites a handful of prior damages determinations: *Binette v. Sec'y of Health & Hum. Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for past pain and suffering and $1,000.00 a year for future pain and suffering), and *Dawson-Savard v. Sec'y of Health & Hum. Servs.*, No. 17-1238, 2020 WL 4719291 (Fed. Cl. Spec. Mstr. July 14, 2020) (awarding $130,000.00 in past pain and suffering and $500.00 per year for future pain and suffering). In addition, Petitioner cites *Lucarelli v. Sec'y of Health & Hum. Servs.*, No. 16-1712, 2019 WL 5889235 (Fed. Cl. Spec. Mstr. Aug. 21, 2019), for the proposition that I should look to the totality of the circumstances, including the uncommon occurrence that both of Petitioner's shoulders were impacted, in formulating an award.

Petitioner asserts her case is comparable to *Binette* because that petitioner experienced pain for approximately two years after her injury, followed by a flare up of almost a year. Pet. Br. at 14. Petitioner in that case received five cortisone injections and participated in two rounds of physical therapy. *Id.* Her treating physician stated she was not a candidate for surgery and that her condition was likely permanent. *Id.* Petitioner argues that Petitioner in this case experienced pain for a longer time period than the petitioner in *Binette*, and experienced decreased range of motion in *both* shoulders rather than just one. *Id.* at 14-15. Petitioner asserts that the ongoing pain in both of her shoulders presents a case more severe than *Binette. Id.* at 15.

Petitioner acknowledges that the petitioner in *Dawson-Savard* received more post-vaccination injections, but argues that this is because the injections provided relief, even if the relief was short-lived. Pet. Br. at 15. Further, Petitioner emphasizes that the petitioner in *Dawson-Savard* experienced an injury to one shoulder, while the petitioner in this case was injured in both shoulders. *Id.* Thus, the award in this case should be higher than those in *Binette* and *Dawson-Savard*. Pet. Br. at 15.

### B. Respondent's Arguments

Respondent recommends that Petitioner be awarded only $100,000.00 for past pain and suffering, with no future component. Resp. Br. at 9, 11. He accepts that Petitioner "suffered a painful course with injuries to both shoulders that impacted her self-care, activities around her home, and recreational activities," and that she underwent substantial physical therapy. Resp. Br. at 9. But she did not undergo surgery, or non-surgical manipulation, and received only one steroid injection. *Id.* Respondent otherwise acknowledges that this case is unique. *Id.*

Respondent cites his own preferred comparables to defend the lower sum: *Cooper v. Sec'y of Health & Hum. Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for past pain and suffering and declining to award compensation for future pain and suffering), and *Selling v. Sec. of Health & Hum. Servs.*, No. 16-588, 2019 WL 3425224 (Fed. Cl. Spec. Mstr. May 2, 2019) (awarding $105,000.00 for past pain and suffering). The petitioner in *Cooper* similarly experienced pain and suffering for over two years, and similar impacts on her personal life. Resp. Br. at 10. Respondent asserts that the petitioner in *Selling* similarly experienced pain for over two years, in addition to undergoing two steroid injections, 18 sessions of physical therapy, and a manipulation under anesthesia. *Id.*

Respondent rejected Petitioner's embrace of *Binette* and *Dawson-Savard*, noting that in both of those cases, treating physicians had indicated that the petitioner's condition was permanent. Resp. Br. at 11. In contrast, Ms. Imm has not provided any evidence that her injuries have been deemed permanent, inoperable, or unresponsive to treatment. *Id.* at 12.

## VII.   Appropriate Compensation in this Case

### A.  Past Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

Petitioner's injuries were of sufficient severity that she sought treatment relatively quickly - thirteen days after vaccination. At that time, she was experiencing pain and decreased range of motion. However, by eight months after the onset of Petitioner's injury (the end of January 2019), she was exhibiting significant improvement. Her range of motion in both shoulders was in the normal range. She showed improvement in activities of daily living such as getting dressed and washing hair, and progressed to a strengthening program to maintain her range of motion gains. However, she continued to report mild pain and experience weakness in both shoulders.

In this case, I find that the overall duration of Petitioner's injury was approximately 27 months. The records of the last 13 months of treatment suggest that the therapy during this time was either completely or mostly for her *left* shoulder, suggesting that her right shoulder was mostly better by the 14-month mark. In addition, the record suggests that her left shoulder injury was worse than the right shoulder.

The parties' comparables were reasonable but not fully useful in helping me to calculate pain and suffering. The cases cited by Petitioner, *Binette* and *Dawson-Savard*, for example, reflect more severe injuries, although in both of those cases only one shoulder was injured. Petitioners in both of those cases also experienced range of motion limitations and more pain persisting at the one year mark, and both had more cortisone and other injections but less physical therapy. And both had permanent injuries.

The petitioners from Respondent's cases also suffered more severe injuries than either of Ms. Imm's individual shoulder injuries – perhaps suggesting that the lower sum Respondent embraces is better supported. However, those petitioners only suffered injuries to a *single* shoulder. In *Cooper*, for example, the petitioner still had severely reduced range of motion with pain at the eight month mark, while at that point Ms. Imm had range of motion in the normal range and relatively mild pain. In *Selling*, the petitioner underwent manipulation under anesthesia, while Ms. Imm did not undergo any comparable procedure. Thus, these cases too do not define the best range of possible awards.

I find a particularly apt comparable case to be *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2021 WL 6773160 (Fed. Cl. Spec. Mstr. Dec. 29, 2021), where a petitioner received $117,500.00 for actual pain and suffering.[13] In both *Rodgers* and this case, the injured petitioners experienced bilateral SIRVAs. In both cases, the petitioners did not undergo surgery, and experienced significant improvements in their injuries in under a year. Admittedly, however, the *Rodgers* petitioner did not have any physical therapy, while the petitioner in this case had over 130 sessions, although the petitioner in *Rodgers* also had an additional cortisone shot. The overall duration of the injury in *Rodgers* was shorter (ten months), while in this case the petitioner was significantly improved by eight months, but continued treatment for 14 months for her right shoulder and 27 months for her left shoulder.

This case is unique in both the bilateral nature of her injury and the significant duration and number of sessions of physical therapy Petitioner attended. There is no suggestion that the physical therapy was not medically appropriate. I acknowledge that

---

[13] *Rodgers* admittedly could not be referenced in the parties' briefs because it was issued shortly after the briefing was completed, and was not publicly available until February 1, 2022.

fact that *both* of Petitioner's arms were injured compounded her suffering because she could not compensate for her limitations by using her other arm.

In general, cases not involving surgery receive awards under $100,000.00. However, there are exceptions, and a bilateral SIRVA is a particular strong one. I determine that *Rodgers* is the best comparable, but also that Ms. Imm should receive a higher award due to the longer duration of her injuries and amount of physical therapy. I therefore determine that an award for past pain and suffering of **$130,000.00** is warranted.

### B.  Future Pain and Suffering

Petitioner requests compensation for future pain and suffering in the amount of $1,500.00 per year for the rest of her life. However, I agree with Respondent that Petitioner has not presented evidence that would support such a request. Petitioner primarily justifies this sum on the basis of affidavit evidence asserting that she continues to experience pain and restrictions. However, the most recent medical record evidence is from January 2021, over a year ago, and indicates that at that time Petitioner had full range of motion and mildly positive impingement signs. She also declined a steroid injection, and there is no evidence that Petitioner sought or received further treatment.

Without persuasive medical record evidence demonstrating a permanent disability, which has not been provided in this case, a future pain and suffering award is not warranted. Affidavit evidence may be useful generally to corroborate such medical record evidence, but by itself is not sufficient to prove a permanent disability.

### VIII.   Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $130,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[14] I also find that Petitioner is entitled to $3,871.13 in actual unreimbursable expenses. I find that Petitioner is not entitled to an award for future pain and suffering.**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $133,871.13 in the form of a check payable to Petitioner.**

---

[14] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[15]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[15] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.